## WALKER v. DARST.

The act of 2d February, 1860, reads as follows: "The homestead in a town or city, exempt from forced sale, is hereby declared to be the lot or lots occupied or destined as a family residence, not to exceed in value $2,000 at the time of their destination as a homestead; nor shall the subsequent increase in the value of the homestead, by reason of improvements or otherwise, subject the homestead to forced sale." (Paschal's Dig., Art. 3928.) [This section was re-enacted 10th February, 1866. Paschal's Dig., 2d ed., Art. 3802a.] But this statute, which thus enlarges the value of the town or city homestead, is, *pro tanto*, nugatory.

The constitution intended to limit the country homestead to the quantity of two hundred acres, without regard to the value of the land or improvements; the city or town homestead is limited in value to $2,000, including improvements, and the legislature had no power to enlarge it.

MORRILL, C. J.—The petition in this case alleges that defendant, Darst, on the 31st January, 1860, executed his note payable to plaintiff, in his capacity of guardian of the minor children of James Walker, deceased, for the sum of $1,120 32,

payable 1st July, 1860; that a judgment was obtained on this note, and that executions issued thereon had been returned not satisfied, and no property found; and that the defendant in the executions referred to pointed out property; that defendant has no property known to plaintiff, except certain town lots claimed by him as his homestead, which are particularly described; that these lots were conveyed to the wife of Darst on the 1st October, 1852, and had never been occupied by Darst as a homestead till after the maturity of the indebtedness of Darst to plaintiff; that since that time defendant has placed improvements on the lots of the value of $7,000. The petition distinctly alleges that the homestead is community property of Darst and wife.

A demurrer was filed to the petition, and sustained by the court, and brought to this court by appeal.

The 19th century of the christian era has not become more distinguished for its arts and sciences than for its laws for the amelioration of the human family.

From as far back in the past ages of the world as the history of the laws, usages, and customs of mankind extend, down to the present generation of our race, those who, from any cause—either criminal, speculative, or accidental—had become unable to pay their debts, were not only deprived of what poor pittance they might happen to have, but their persons were subject to imprisonment during the pleasure of their creditors. Even at this day there are distinguished nations and states, a portion of whose citizens are lying in dungeons from no other cause than proverty.

It was a great triumph in civilization when the organic law of a state provided that "no person shall be imprisoned for debt;" but a still greater impetus was given to the happiness of families when the organic law of a state protected a homestead from the inroads of a sheriff.

But while we thus boast, we are in danger of taking the opposite extreme. In avoiding the Scylla of oppression, we

must guard against shipwreck upon the Charybdis of dishonesty. One extreme is apt to be in close proximity with the opposite. [?]  As the act to prevent frauds and perjuries was once said to be construed in such a way and manner as to promote fraud, so the homestead provision of our constitution is liable to be so construed as to take away the homesteads of honest creditors, [debtors?]

The 22d section of article VII of the constitution of 1846 is as follows:

" The legislature shall have power to protect by law from forced sale a certain portion of the property of all heads of families.   The homestead of a family, not to exceed two hundred acres of land, (not included in a town or city,) or any town or city lot or lots, in value not to exceed $2,000, shall not be subject to forced sale for any debts hereafter contracted, nor shall the owner, if a married man, be at liberty to alienate the same, unless by the consent of the wife, in such manner as the legislature may hereafter point out."

The meaning of this provision is as free from ambiguity as language can make it.

The constitution defines a rural homestead, as well as an urban homestead, and places a limit on each beyond which we cannot pass, either directly or indirectly, either by an open disregard and direct defiance of its requirements, or, indirectly, by ascribing to words and terms a definition unauthorized either by common usage or by the context.

A tract of land without a house, tent, or camp, of some kind, furnishing its owners "from storms a shelter and from heat a shade," without any of the paraphernalia necessary for comfort or existence, cannot be called a homestead for a civilized man; even savages have their primitive and movable tents, and the wild beasts have their shelters. Neither can a house, camp, or tent, whether composed of wood, stone, clay, or cloth, or of a combination thereof, have an existence without land to rest upon.

It takes both land and house to constitute a home, and

this house, when owned by the occupants, is the homestead. The value of the homestead is estimated by ascertaining the sum of all its parts, and not of any one of them. The land in its primitive and natural state is estimated from its fertility, its salubrity, its commercial and manufacturing advantages, and this value may be enhanced or diminished according to circumstances. There may also be an estimate made of the trees, shrubbery, fences, ornamental walks and drives, cisterns, fountains, houses, and other fixtures placed thereon; but the value of the homestead is estimated by taking into consideration the value of both land and fixtures. It cannot be even supposed that the framers of the constitution, in exempting a homestead from forced sale, permitted the house, situate upon a lot or lots not exceeding $2,000 in value, without estimating the house, to be sold by the sheriff.

One who would seriously advocate that a husband, without the consent of the wife, could sell the house, provided the land should be worth $2,000, exclusive of the house, would not place a high estimate upon the method taken by the framers of the constitution to preserve the homestead to the wife intact. Even had the constitution exempted from forced sale a town lot of a family, without specifying it as a homestead, the universal understanding, that the fixtures upon real estate are a part of the reality, would have left no doubt of its construction.

The views we have taken are in no respect different from what has been decided by this court, whenever the question has arisen requiring its decision. In Wood v. Wheeler, 7 Tex., 16, HEMPHILL, C. J., dwelt somewhat extensively upon the homestead question, and on page 23 assumes, as a matter without controversy, that the "improvements on a lot cannot be separated from the lot."

In North v. Shearn, 15 Tex., 175, the question before the court was whether, when a lot was worth $400, and the improvements thereon were worth $3,000, total $3,400, the

excesss of $1,400 over $2,000 was liable to exemption in favor of a creditor. Judge WHEELER, in giving the opinion of the court, sustained the position, on the authority of Wood v. Wheeler.

In Hancock v. Morgan, 17 Tex., 584, a similar question arose, and similarly decided by Judge LIPSCOMB.

In Franklin v. Coffee, 18 Tex., 416, the defendant in the judgment claimed an exemption of two hundred acres of land on which there once had been a house and some land in cultivation, but not at the time of trial. HEMPHILL, C. J., stated as the opinion of the court, that "a homestead necessarily includes the idea of a house for residence;" and because the defendant did not reside on the premises it was not his homestead, and was liable to be sold at forced sale.

In Williams v. Jenkins, 25 Tex., 306, the district court had decided that the $2,000 exemption related to the lot or lots, and not to the improvements thereon. The argument of the counsel, in entertaining the position of the district court, was exhaustive of the subject, and amply vindicatory of their high reputation. Judge ROBERTS, speaking for the court, said: "In valuing a lot or lots, that constitute a homestead, the improvements would naturally be understood to be included in the valuation, unless expressly excluded. The term lot, in common use, means a piece or parcel of land, and a conveyance of it would carry with it any improvements that might be erected on it."

The decisions herein quoted embrace a period of the first fifteen years after the adoption of the constitution, and formed the settled law of the land. It is the construction of the constitution by the supreme court. Were it a statutory and not a constitutional provision, the legislature could alter, change, or modify the law, and this court would be bound to make their decisions in compliance with the requirements of the modified law.

In 1866 a new constitution was formed and ratified by

the people. This new constitution contains the identical words and section that the old constitution did on the homestead question. The decisions of this court were well known to most of the members of the convention that framed the constitution, and were affirmed.

When a question has been subject to as much argument and to so many uniform decisions as the one now before the court, it is entitled to be considered as adjudicated and no longer an open question.

It is presumed that the district judge conceived that the legislature had power to alter the constitution, or, which is the same thing, to construe its provisions into an alteration by exempting from forced sale the improvements upon a lot or lots to an unlimited amount. (Paschal's Dig., Art. 3928.)

When the constitution provides that the homestead, consisting of land and improvements thereon, exempt from forced sale, shall not exceed $2,000 in value, any law or statute that directly or indirectly contravenes this provision is, *pro tanto*, nugatory.

It is perfectly obvious that there can be a great difference in value between the rural and urban homestead. The rural homestead can have no limit in dollars, but only in the number of acres. It is not improbable that the intention was to favor the farmer and planter in every practical manner. By holding out inducements to the cultivators of the soil that are denied to the mechanic, the merchant, and the manufacturer, by saying to the farmer that he can select two hundred acres of land, which he may put in the highest state of cultivation, and upon which he may place whatever may contribute to either his real or imaginary wants or necessities or fancy, and that his home shall never be invaded by a creditor or his agent, but shall always be sacred as a home, is not a small or slight inducement to a man to engage in agriculture. By assuring the wife and mother that she can retire into a rural district and

select from the vast regions of Texas a place free from the scenes and allurements of a city, and there bring up and educate her family, and to know that, while she is beautifying her home and adding comforts to conveniences and fancies to comforts, this home is her home; that whatever misfortune may befall her husband, either in business or habits, this home is secure, and no one can take it from her and her children, is a persuasive argument to a country life. The settlement of the lands and bringing them into cultivation have always been a favorite policy of the public authorities of this state.

On the other hand, both honesty and frugality of the inhabitants of a city can be subserved and promoted by withholding all inducements to erect costly palaces with funds justly belonging to their creditors. If it is known that the sum of $2,000 is the limit to a city homestead, the number of rich bankrupts would be greatly diminished, and of solvent traders proportionally increased.

It is not our province to know, either judicially or otherwise, what were the motives of those who made the constitution that caused them to make this marked difference in the two classes of homesteads. It is enough for us to know that this difference exists, and that it is our duty to do nothing in violation of this instrument, whether it may appear to us right or wrong, politic or impolitic.

REVERSED.

*Note by the Reporter.*—This opinion is found in the pamphlet of opinions published by the clerk. The record was not furnished to the *Reporter*, because a rehearing was granted in the case. It is given as matter of history, because such an opinion, pronounced in the face of the constitution, which gave the power to the legislature to exempt the property of families, and of two statutes making such exemptions of improvements, must have induced the con-

vention of 1868–1869 to leave no doubt in the new constitution. The convention thus makes organic what the legislature had twice declared.