[Miller v. Marx ; Smith's Adm'r v. Smith ; Anthony's Adm'r v. Anthony.]

# Miller *v.* Marx.

*Bill in Equity for Dower and Homestead Exemption in Mortgaged Lands, and Injunction of Sale under Mortgage.*

# Smith's Adm'r *v.* Smith.

# Anthony's Adm'r *v.* Anthony.

*Petitions for Allotment of Homestead to Widow and Children.*

1. *Homestead exemption ; constitutional provision self-acting, and how far restraining legislation.*—The second section of the fourteenth article of the constitution of 1868 (tenth article of the constitution of 1875), which declares that "every homestead, *not exceeding* eighty acres," &c., "*shall be exempted* from sale on execution, or any other process from a court, for any debt contracted after the adoption of this constitution," is self-acting, and absolutely exempts such homestead without the aid of any legislative provisions ; and, while limiting the minimum of the exemption, does not impose any restriction on the power of the legislature to increase it.

2. *Same; limitation as to value.*—The limitation of value to two thousand dollars, contained in that section, applies to homesteads in the country, as well as to those which are in a city, town, or village.

3. *Same; homesteads exceeding limit.*—If the homestead, when reduced to its lowest practicable dimensions, exceeds the constitutional limit of two thousand dollars in value, no court has any power, in the absence of statutory provisions, to allot any exemption in the premises, or to allow an equivalent for a homestead exemption.

4. *Same; alienation by mortgage.*—A mortgage, or other alienation of the homestead, by the husband alone, is absolutely void, and inoperative for any purpose; but, if the wife joins in the conveyance, and it is acknowledged by her and her husband before a proper officer, who certifies the fact of such acknowledgment, in the form prescribed by the statute for other conveyances (Rev. Code, § 1548), such certificate is, in the absence of all statutory provisions on the subject, sufficient proof of "the voluntary signature and assent of the wife ;" and it can only be impeached by proof of fraud or imposition practiced towards her—a fraudulent combination between the parties interested and the officer taking the acknowledgment.

5. *Same ; rights of widow and children.*—On the death of the husband, leaving a widow or minor child or children, or both a widow and minor child or children, the homestead exemption continues during the life of the widow and the minority of the children ; but they take no title to the premises, and have only the right to use and occupy them, and the property reverts to the estate whenever the exemption ceases; and this homestead exemption to them is freed from administration, descent, and devise, as well as from debts.

6. *Same; statutory provisions in Revised Code.*—The provisions of the Revised Code as to homestead exemptions (§§ 2061, 3539 G), being inconsistent with the provisions of the constitution since adopted, are repealed by it; but this repeal does not affect the provisions of said section 2061 as to the exemption of personal property.

7. *Same; governed by what law.*—Exemptions in favor of the widow and

children, from liability for the debts of the deceased husband, are governed
by the laws which are in force at the time of his death.

8. *Same ; statutory changes by act of April* 23, 1873.—The act in relation to
exemptions, approved April 23, 1873 (Sess. Acts 1872-3, pp. 64-69), has
enlarged the area of the homestead, if in the country, to one hundred and
sixty acres, without any limitation as to value; provides for the ascertainment
and apportionment of an equivalent in money, where the homestead is excess-
ive in value, and incapable of subdivision ; vests the homestead absolutely in
the widow and children, when the estate of the deceased husband is insolvent;
and requires that the wife's voluntary signature and assent to a mortgage, or
other alienation of the homestead, shall be shown by her examination separate
and apart from her husband; and these changes apply to all homestead exemp-
tions which have accrued since the passage of that act.

THESE cases, though decided together, were argued and
submitted at different times. The case of *Miller v. Marx* is
an appeal from the Chancery Court at Mobile, and was
heard before the Hon. ADAM C. FELDER ; the case of *Smith's
Adm'r v. Smith* is an appeal from the Probate Court of
Choctaw, and was heard before the Hon. J. S. EVANS ; and
the case of *Anthony's Adm'r v. Anthony,* an appeal from the
Probate Court of Greene, was heard before the Hon. Thos.
W. ROBERTS.

On the 8th September, 1871, Mrs. Melaine Marx, the widow
of Henry Marx, deceased, filed her bill in equity against
Thomas P. Miller, and the administrator and children of her
said husband ; praying an injunction against said Miller, to
restrain him from selling a house and lot in the city of Mo-
bile, under a mortgage executed to him by the complainant
and her husband in his life-time ; and that said mortgage
might be declared inoperative and void as against the com-
plainant's right of dower in the premises, and as against her
right to a homestead exemption therein during the minority
of her infant children ; " and that she may be decreed to be
entitled to her dower right in and to the said land and prem-
ises, and, in addition thereto, to an interest therein to the
extent of two thousand dollars ; and that it be decreed that
she is entitled to said land and premises, as aforesaid, as a
homestead during the minority of her said children ;" and
for other and further relief. The mortgage, which was made
an exhibit to the bill, was given to secure the payment of a
bill of exchange for $4,770, given by said Henry Marx to
said Thomas P. Miller for borrowed money, and payable
March 18–21, 1871 ; contained a power of sale, on default
being made in the payment of the bill at maturity; and was
acknowledged by the said Henry Marx and his wife, on the
19th March, 1870, before a justice of the peace, whose certi-
ficate of the acknowledgment is in the form prescribed by the
statute (Rev. Code, § 1548) for the acknowledgment of con-

veyances generally. Henry Marx died on the 9th November, 1870, leaving a widow and six minor children, who were residing with him at the time of his death on the mortgaged premises, and continued to reside there when the bill was filed. He left a will, which was regularly admitted to probate, but the widow dissented from it, and claimed her dower and distributive interest in the estate. The bill alleged, that the estate of said Henry Marx was insolvent, and that the house and lot conveyed by the mortgage were, at the time it was executed, occupied by him and his family as his homestead; and in regard to the execution of the mortgage by the complainant, its allegations were in these words:

"Oratrix signed her name to said mortgage deed, in the presence, and at the request of her said husband; but she avers that it was not her voluntary act, and that she did not voluntarily assent to the same—that she signed her name to said mortgage under the following state of facts: On or about the 19th March, 1870, her said husband and a gentleman who she was afterwards informed was a justice of the peace, or a notary public, came together to the residence of her said husband, when her husband asked her to sign a mortgage to the house and lot in which they lived, and she did sign it, as requested; but it was not read over to her, nor did she know its contents, further than was said to her by her husband as aforesaid. No question was asked, before, or at the time she signed it, nor afterwards, by the gentleman who was said to be a justice of the peace, or a notary public; and oratrix repeats, that it was not her voluntary signature, nor did she voluntarily assent thereto—that she signed said mortgage deed from fear that her refusal to do so would not only give displeasure to her said husband, but would create an ill feeling on his part towards her, that might lead to a separation between them; that she knew, at the time, that her husband was greatly embarrassed with debt, and had his real estate mortgaged, and had been borrowing money at a high rate of interest; that she was so much troubled on account of having signed said mortgage, that she wept until she was sick; that she left the room as soon as she signed her name to the said deed, and did not return to it until her husband and the gentleman referred to had left; and that the only persons present when she signed her name as aforesaid, besides herself, were her said husband, the gentleman who was said to be a justice of the peace, or a notary public, and her son, Maurice Marx."

The defendant, Miller, answered the bill, insisting on the validity of his mortgage; asserting, on information and belief, that the complainant signed and acknowledged it voluntarily;

denying that any improper inducements or means were used to procure her signature or acknowledgment; and alleging that, if any fraud, force, or other improper influence was exerted towards her, it was not by his procurement or connivance, and was without his knowledge, and that he had no notice of it when he advanced his money on the faith of the mortgage. He demurred to the bill for want of equity, because, among other reasons, it showed on its face that the mortgage was voluntarily executed by the complainant, and was valid and binding on her; and because it did not show that he had any notice of the alleged want of assent on her part. A formal answer was filed by the personal representative of Henry Marx, and also by the guardian *ad litem* of the infants.

The chancellor overruled the demurrer, and on final hearing, on pleadings and proof, held that the mortgage was valid, except as to the complainant's right of dower and homestead, and the right of the infant children to a homestead during their minority. He therefore ordered an account to be taken of the mortgage debt, and a sale of the house and lot; but directed the register to retain out of the proceeds of sale the sum of two thousand dollars, as the value of the homestead, and an additional sum for the value of the dower when ascertained; and allowed the cause to stand over, in order that the complainant might amend her bill by setting up her homestead right, and that the guardian *ad litem* might file a cross bill, setting up the claim of the infants to a homestead exemption. The amendment having been made, and the cross bill filed and brought to a hearing, the chancellor held that the complainant was not entitled to dower in the mortgaged premises, but was entitled to a homestead therein, to the extent of two thousand dollars, "for the benefit of herself during her natural life, and of her said children until the youngest of them surviving attains the age of twenty-one years;" and he directed the register to invest the sum of two thousand dollars, of the moneys in his hands arising from the sale, in a homestead for her and her children, taking the title in his own name officially in trust for them.

The overruling of the demurrer to the bill, and the final decree, are now assigned as error by the defendant Miller.

Thos. H. Herndon, for the appellant.—1. The allegations of the bill do not show that the complainant did not execute the mortgage voluntarily. On the contrary, her own statements show that she signed it freely and voluntarily, without any hesitation, and with full knowledge of the effect of the instrument. A case strikingly similar is that of *Baldwin v·*

[Miller v. Marx; Smith's Adm'r v. Smith; Anthony's Adm'r v. Anthony.]

*Snowden,* 11 Ohio St. 203–10. See, also, *Louden v. Blythe,* 27 Penn. (3 Casey,) 22.

2. Even if any undue influence was used by her husband to procure her signature and acknowledgment (of which, however, there is not a particle of evidence), it is neither alleged nor proved that the mortgagee had any connection with it, or any notice of it, either actual or constructive. The mortgage came to his hands duly certified by an officer authorized by law to take acknowledgments; and the acknowledgment can not be impeached, to his injury, except for fraud or imposition, in which he participated, or brought to his notice before he parted with his money.—Cases cited *supra;* also, 43 Ill. 478; 42 Ill. 514; 4 Harr. Penn. 532; 5 Wisconsin, 550; 18 Iowa, 95; 9 Barr, 14; 6 Blackf. 391; 3 Yerger, 648; 3 Wheaton, 457, 468; 2 Vesey, 458; 10 John. 193; 6 Cranch, 133; 2 Vern. 159; *Hartley v. Frost,* 6 Texas, 208; 1 H. & McH. 211; 3 Ib. 321.

3. The mortgage being valid, no homestead right existed in the husband at his death, except, possibly, in subordination to the mortgage; and his widow and children can assert none as against the mortgagee.—5 Kansas, 239, and cases above cited from Iowa, Wisconsin, Texas, and Illinois.

BOYLES & OVERALL, *contra.*—1. The proof shows that the wife's signature to the mortgage was not her voluntary act; that she did not sign it from choice, but at the request of her husband, and in his presence, and from fear of his displeasure. The constitution, in its provisions as to homestead exemptions, intended to guard married women against the fear, undue influence, and importunity of their husbands, and to secure to them rights which could not be taken from them by the folly, imprudence, recklessness, or improvidence of their husbands—rights of which they could not be deprived without their own "voluntary signature and assent." These emphatic words, cumulative almost to the verge of tautology, show that alienations of the homestead are protected by greater restrictions than the law requires in ordinary conveyances; and effect must be given to each word. Neither the wife's signature to a mortgage, nor her acknowledgment of it, is sufficient to give it validity. It must be shown to be her voluntary act—to have the voluntary assent of her mind, with full knowledge of all the facts. There is no statute which makes the ordinary certificate of a notary sufficient proof of this "voluntary signature and assent;" and in the absence of legislation, the courts can not give it that effect. The burden of proving that the act was voluntary is on the party who asserts it, and who claims under it. If the words

were only a statutory requisition, the certificate of acknowl-edgment would not show a substantial compliance.—*Boykin v. Rains*, 28 Ala. 340. As to the alienation of homesteads, and the strictness with which constitutional provisions on the subject are construed by the courts, see *Lane v. Dolick*, 6 McLean, 200 ; 1 Clarke, Iowa, 413 ; 6 Minn. 25, 500 ; 51 Penn. 309 ; 2 Vroom, N. J. 21 ; 22 Illinois, 363 ; 1 Cal. 436 ; 7 Bush, Ky. 156 ; 50 Illinois, 521 ; 5 Kansas, 239 ; 18 Iowa, 90 ; 19 Wisconsin, 472 ; 1 Nev. 668.

2. If the mortgage is void as to the wife, it is void and in-operative altogether—void for all purposes.—Authorities *supra ;* also, 31 Illinois, 113, 157, 174, 200 ; 10 Mich. 291 ; 14 Cal. 472 ; 12 Cal. 327 ; 8 Cal. 66, 75, 347 ; 5 Wisconsin, 534. Being void, it does not affect the wife's right to dower ; and she can claim dower in addition to her rights in the home-stead.

3. Whatever may be the validity or effect of the mortgage, it can not deprive the children of their constitutional right to a homestead during their minority. The words of the constitution are plain and unambiguous, leaving no room for construction. The homestead is exempt, "*in all cases,* during the minority of the children. The exemption is as general as language can make it. It does not except home-steads which are incumbered by mortgages, nor homesteads upon which there may be judgment liens ; and to except them from its operation, would not only interpolate in the constitution words which its framers did not use, but would exclude from its benefits those who most need them. A mortgage is nothing more than a security for a debt.—1 Hilliard on Mortgages, 1–4, and cases cited. The interest of the mortgagor, before the law day, is subject to levy and sale.—19 Ala. 722, 753 ; 21 Ala. 288. When the mortgagor dies in possession of the mortgaged premises, occupying them as his homestead, the homestead right descends to his children, and they can not be dispossessed by a foreclosure of the mortgage during their minority.

---

On the 30th December, 1871, George F. Smith died in Choctaw county, where he resided, intestate ; and letters of administration on his estate were duly granted by the Probate Court of said county, on the 24th January, 1872, to Silas M. Smith. On the 10th February, 1874, said estate having been reported insolvent, Mrs. Mary J. Smith, the widow, filed her petition in said Probate Court, asking an allotment to her of one hundred and sixty acres of land, which

she particularly described by its government numbers, as a homestead for herself and her two infant children, who constituted the decedent's family at the time of his death, and also one thousand dollars' worth of personal property, to be selected by commissioners ·appointed by the court. The petition was filed under the act approved April 23, 1873, and the petitioner claimed to be entitled to the benefit of its provisions. Certain creditors of the estate appeared, and demurred to the petition, but their demurrer was overruled; and they then filed an answer. On the hearing, it was admitted that the decedent died in said county, seized and possessed of the lands described in the petition; that his homestead was in the county, and that his widow and two infant children composed his family at the time of his death; but there was no averment, admission, or other proof, that the lands which were claimed as a homestead, or the larger tract of which they formed a part, constituted his homestead at the time of his death. The court rendered a decree in accordance with the prayer of the petition, and its decree is now assigned as error. There is a bill of exceptions in the record, but it does not show that any exception was reserved to the overruling of the demurrer to the petition, or to the final decree of the court. The appeal is sued out by the administrator, who alone assigns errors.

COLEMAN & GLOVER, with WATTS & SONS, for appellant, cited *Taylor v. Taylor's Children,* 53 Ala. 135; *Rottenbury v. Pipes,* 53 Ala. 447.

---

David R. Anthony died in October, 1871, at his residence in the town of Eutaw, Greene county; leaving a widow and two infant children, who composed his family. His widow married again, and died in the latter part of the year 1874. His estate was reported and declared insolvent, in September, 1875; and on the 4th October, 1875, the two minor children filed their petition in the Probate Court of said county, asking the appointment of commissioners, or appraisers, "to lay off and set apart to petitioners five hundred dollars worth of land, so as to include the homestead in which their father died, situated in the town of Eutaw," describing it, "or such portion thereof as can be selected without injury to the remaining portion of the estate; or, if that can not be done, that said appraisers be required to lay off other lands in the place of said homestead, to be estimated by them, and set off by metes and bounds;" or that the lands might be sold by

[Miller v. Marx ; Smith's Adm'r v. Smith ; Anthony's Adm'r v. Anthony.]

the administrator, and five hundred dollars be paid to them out of the proceeds of sale. The administrator demurred to the petition, on the ground that the statute under which it was filed (Rev. Code, § 2061) had been repealed by the act approved April 23, 1873, and the petitioners were not entitled to claim a homestead, or its equivalent, under the provisions of that law; and he set up the same defense by way of plea, and in his answer. The court overruled the demurrer and plea, and rendered a decree in accordance with the prayer of the petition; to which rulings and decree the administrator excepted, and he now assigns them as error.

W. P. WEBB, for the appellant, cited *Taylor v. Taylor's Children*, 53 Ala. 135; *Rottenbury v. Pipes*, 53 Ala. 447; also, *Medical College v. Muldon & Sons*, 46 Ala. 610; 1 Hill, 324; 9 Wallace, 506.

COLEMAN, CLARK & MCQUEEN, *contra.*—The petitioners' right to a homestead accrued under section 2061 of the Revised Code. The subsequent act of 1873 was a remedial and enlarging act, and was not intended to take away or impair any rights which had vested under the former laws. A retrospective operation will never be given to a statute, unless the intention that it shall so operate is clearly expressed.—9 Bacon's Abr., *Statute;* 2 Mod. 310; 10 Mass. 437; 12 Mass. 383; 16 Mass. 215; 6 Porter, 109; 2 Ala. 54; 18 Ala. 668; 19 Ala. 707, 619; 26 Ala. 535.

STONE, J.—On the 23d December, 1812, it was enacted by our then territorial legislature, "That hereafter lands, tenements, and hereditaments shall be subject to the payment of all judgments or decrees of any court of record within this territory, and the clerk of such court shall frame the execution . accordingly, \* \* \* *provided*, that courts holden by justices of the peace shall not be deemed courts of record within the meaning and provisions of this act; and the sheriff, or other officer, selling any real estate, shall make a title to the purchaser, which title shall vest in the purchaser all the right, title and interest which the defendant had in and to such real estate, either in law or equity." Toulm. Digest, 307, § 9. The law stood thus, leaving all the property of a debtor, real and personal, subject to seizure and sale in payment of his debts, until the introduction into our legislature of what is known as the exemption policy. We should except, however, from this general remark, the qualified exemption from levy and sale of property lying or being " on premises held under lease," under the act of Feb-

ruary 10, 1807, and exemption of growing crops from execution sale, under the act of November 27, 1821.

Exemptions proper, like many other subjects that have grown into a fixed policy, had a small beginning. The first statute was enacted on the 12th January, 1833. It was confined to a few chattels, of agricultural and family necessity. On the 14th February, 1843, a few articles were added to the list.—See Clay's Dig. 210, § 47. On the next day, February 15, 1843, the act " to exempt real estate, not exceeding forty acres, from execution upon contracts hereinafter made," was passed.—See Pamph. Acts, 73. The further and continuous growth of the system is found in sections 2880 to 2884 of the Revised Code of 1867. It was made a part of the permanent, organic law of the land, by the constitution of 1868 ; and is retained and preserved in the constitution of 1875.

An examination of these various progressive enactments will show that, in this State, the principle of exemption of part of the property of the citizen from levy and sale has ripened into a permanent policy ; and these statutes have always received a liberal construction at the hands of the courts.—1 Brick. Dig. 908, § 255. So, a similar principle has sprung up, and become a policy, apparently fixed, in almost every State in the Union. Rhode Island, Delaware and Oregon, we believe, are the only States that have not such statutes. And in many of the States, particularly the new ones, the exemptions, as with us, have been incorporated in their constitutions. So, this sentiment in favor of exemptions may be safely treated as the settled policy of the country.

Exemption is not intended merely as a boon to the head of a family. It has a broader purpose. It proposes to secure to the resident and his family a home and a shelter, of which they cannot be deprived by the visitations of adversity, or by the demands of creditors. It provides alike for the family, while the head of it is living, and for the widow and children, composing the family after his death. So clearly is this manifested, that the homestead cannot be alienated by mortgage or otherwise, "by the owner thereof, if a married man, without the voluntary signature and assent of the wife." Speaking of the purpose of such legislation, the Supreme Court of Iowa, in *Parsons v. Livingston*, 11 Iowa, 106, said, it was " based upon the idea, that it is a matter of public policy, for the promotion of the prosperity of the State, and the general good of the people, that such citizen should be independent and above want—that he should have a home, a place where he and his family may live in society, beyond the reach of financial misfortune, and the demands of creditors."

[Miller v. Marx; Smith's Adm'r v. Smith; Anthony's Adm'r v. Anthony.]

In *Walker v. Darst*, 31 Texas, 682, the court commented approvingly on the impetus that was given to the happiness of families, when the organic law of the State protected the homestead from the inroads of the sheriff, "by assuring the wife and mother that she can retire into a rural district, and select from the vast regions of Texas a place free from the scenes and allurements of a city, and there bring up and educate her family, and know that while she is beautifying her home, and adding comforts to conveniences, and fancies to comforts, this home is her home; that whatever misfortune may befall her husband, either in business or habits, this home is secure, and no one can take it from her and her children."

Speaking of the protection thrown around the homestead by the law, Chief Justice HEMPHILL, in *Wood v. Wheeler*, 7 Texas, 22, said: "Its design was, not only to protect citizens and their families from the miseries and dangers of destitution, but also to cherish and support in the bosom of individuals those feelings of sublime independence which are essential to the maintenance of free institutions."

Conceding, as we do, that the policy of our exemption laws is both humane and promotive of the general welfare, it is worthy of serious inquiry, whether we have not already gone far enough, if not too far, in the matter of screening property from the payment of debts. A just boundary should be adhered to—NOT exposing the poor and unfortunate to the miseries of destitution, nor enabling the faithless unduly to withhold their property from the payment of honest debts. While we think and hold, that our constitutional and statutory exemptions must be upheld in their integrity, we do not feel at liberty to extend their provisions by implication. We will endeavor to give a natural and reasonable interpretation to the various provisions of the former.

1. Article XIV of the constitution of 1868, and article X of the constitution of 1875, except the 7th section of the latter, are identical. Section 2 of that article relates to homestead. It is contended that, inasmuch as the exemption provided for under the first clause of that section is of "every homestead, *not exceeding* eighty acres," or, in lieu thereof, "any lot in the city, town, or village, * * and not exceeding the value of two thousand dollars," that this is a limitation on the power of the legislature, beyond which that body cannot enlarge the exemption. The words "not exceeding," in each place in which they are found in the clause above, must receive the same interpretation. They are employed to express a limitation on something. What is it? We may probably best understand the subject of this limita-

tion, by inquiring whether the framers of the constitution intended thereby to declare personal rights of the citizen, or to define a rule for the government of the legislature. If the former, then the clause is legislative in its character, and needs no legislation to give it force. If the latter, the clause is inert, and must remain so until legislation gives it vitality. Evidently, they must have intended the former; for there is nothing in the section under discussion, which contains directions to the legislature, or which requires legislative action to give it vitality or force. The clause, as far as it extends, has the form and properties of a law, declarative of the will and purpose of the sovereignty; and it is self-executing. Hence, it is not, in form or substance, a command or direction to the legislature. It intended to exempt the homestead, as an accomplished fact; not to instruct the legislature how it should be done.

It being thus shown that the clause in question is, in its nature, legislative, and not a rule to govern the legislature, the question again comes up, what are the purpose and object of the limitation? What does it limit? Homestead was the subject. If it had its *situs* in the country, it was to be measured by quantity, as well as value. If in a city, town, or village, the measurement was by value only. The homestead in the country might consist of hundreds or thousands of acres. It was not intended to exempt every homestead in its entirety. The homestead which the constitution exempted must not exceed eighty acres. If it contain a greater number of acres, then the owner thereof is authorized to select from the larger tract *eighty acres*—"not exceeding eighty acres"—as his homestead, provided it does not "exceed the value of two thousand dollars."

The clause "not exceeding," is certainly a limitation; and whatever it does operate upon, it must certainly limit, either upwards, or downwards. Let us inquire how it will operate, if it be held to be a limitation on the power of the legislature. The first result is that, under the constitution, there is no exemption of homestead, until the legislature shall declare of what it shall consist; and, second, if so held, it must be that it is a limitation upward—that it fixes a maximum, beyond which the legislature cannot go. A proper paraphrase of the clause then would be, *The legislature shall have no power to exempt as a homestead exceeding eighty acres of land, &c.* This would clearly be a restraint of the power of the legislature, upwards. They could not go beyond the eighty acres in quantity. Would it impose any restraint, or limitation, downwards? Clearly not; for, under such construction, the section contains no words that can be tor-

tured into such a meaning. The legislature, under this supposed interpretation, could reduce the homestead, at their pleasure, below eighty acres in quantity, and below two thousand dollars in value.

What was the purpose of the framers of the constitution, in incorporating in it provisions securing homestead, and exemptions of personal property? Was it to embody such provisions in the organic law, and thus place their repeal beyond the power of the legislature; or did they merely intend thereby to circumscribe the power of the legislature, and fix a limit beyond which it cannot go? The article on the subject of "Exempted property" contains four sections on this subject—1, 2, 3, and 5. All of them, unless section 2 be an exception, secure benefits to the residents of this State, which cannot be taken away or impaired by the legislature. The benefits secured by the provisions in sections 1, 3, and 5, are absolute, and irrepealable. In these, then, the legislature intended to confer benefits, as a permanent, unalterable boon to the family. Would it not be strange that the constitution should have thus liberally, even bounteously, provided for families in the matter of personal property, and the succession to the homestead; while in the same article, it should be construed as restricting, both in quantity and value, the homestead right of the family—by far the most needed and valuable of all the exempted property—to a fixed area and valuation; and as leaving the legislature without restraint, in the reduction of the homestead to the most insignificant dimensions, and the most trifling valuation? One thousand dollars in personalty absolutely secured; while the real estate, which constitutes the homestead, may, at the will or caprice of the legislature, be so reduced, both in quantity and value, as to be utterly worthless? Such is the inevitable sequence of holding that the words, "not exceeding," in section 2, are a limitation on the power of the legislature. The advocates of this construction are forced to maintain the proposition, that sections 1, 3, and 5, are enabling, and section 2 restrictive in their character; that the former three sections confer benefits, while the latter takes them away. We think that the language employed, the policy of the country, as shown alike by sections 1, 3, and 5, and by the public history of the times, equally forbid such interpretation.

Another view: Section 2 of the article under discussion, like sections 1, 3, and 5, declares an exemption. "Shall be exempted from sale on execution," &c., is its language. "Every homestead," omitting the qualifying clauses, "shall be exempted." The section then expresses two additional conditions of such exemption; first, it shall operate only

against debts " contracted after the adoption of this consti-
tution;" and, second, it " shall not extend to any mortgage
lawfully obtained, but such mortgage, or other alienation of
such homestead, by the owner thereof, if a married man,
shall not be valid, without the voluntary signature and assent
of the wife." We submit that these clauses are singularly
inapt, and out of place, if section 2 be only a limitation on
the power of the legislature. Such construction presents the
anomaly in law-making of, first, placing a restraint on the power
of the legislature upward, leaving that body free to reduce the
homestead even to nothing; for such is the result of holding
that there is no limitation downward; and then, in the same
section, prohibiting the owner, if a married man, from dispos-
ing of such homestead, without the voluntary signature and
assent of the wife; first limiting the power of the legislature,
by declaring a maximum beyond which it cannot go, and in
the same section, hedging around whatever of homestead the
legislature may leave to the family, by embarrassing condi-
tions in its dispositions; thus, in one and the same section,
the leading, paramount purpose of which is restriction of the
homestead-right, reserving and securing in the wife an insur-
mountable barrier to its disposition, save by her voluntary
signature and assent. A strange incongruity of policy and
purpose.

Having shown, as we think, that this whole article is leg-
islative in form and substance, and not a direction to the
legislature, it must be construed as if it were a mere legisla-
tive enactment. So considered, no one would question that,
under its provisions, the homestead would stand absolutely
exempted, to the extent of eighty acres in quantity, and two
thousand dollars in value. In the administration and execu-
tion of such statute, there would be no power anywhere to
reduce the homestead below the given quantity and value.
The convention understood well how to express limitations
on legislative power. Sections 14, 31, 32, 36, of article IV,
are samples of the laconic terms in which they could and did
express such limitations. It is singular that, with such self-
imposed guides, they should have employed the circumlocu-
tion found in section 2, article XIV, to express such limitation,
when the object could have been accomplished, relieved of
all ambiguity, by the simple phrase, " The general assembly
shall not have power," &c. In this connection, it is worthy
of remark, that the general assembly is no where mentioned
in article XIV of the constitution.

We hold, then, that the constitution, by its unaided force,
and without legislation, exempts every homestead absolutely
and entirely, with the two limitations; first, that if it be in

the country, it shall not exceed eighty acres in quantity, no matter what its value may be, unless it exceed two thousand dollars; second, that whether in the country, or in a city, town or village, it shall not exceed two thousand dollars in value. This right to the homestead, within the limits named, is secured absolutely to the owner by the constitution itself; and cannot be reduced or impaired by the legislature. The clause under discussion imposes no restraint on the legislative power to increase the exemption.

We are aware that in *Beecher v. Baldy,* 7 Mich. 488, this precise question was decided differently. While we have the highest respect for the court, and for the distinguished jurist, Christiancy, by whom that decision was pronounced, we cannot agree with him on this question. Mr. Smyth, in his work on Homestead and Exemptions, after giving a detailed statement of the principles declared in that case, says, in a note to section 67, "We have given an extended notice of this case of *Beecher v. Baldy,* as it presents an interpretation of the statute in relation to homesteads, at variance with most of the cases which have come under our observation." He cites several authorities, all of which we have examined, except *Cohen v. Davis,* 20 Cal. 187. They shed no light on the question discussed above. They chiefly treat of the repeal of statutes by subsequent enactments that are variant.—See 2 Brick. Dig. 463 ; *McCartee v. Orphan Asylum Society,* 9 Cow. 439.

2. We have said above, that the limitation of value of the homestead exemption, under the constitution, to two thousand dollars, applies alike to a residence in the country and to a lot in a city, town, or village. This interpretation is forced upon us by the language of the constitution which secures the exemption. The first limitation on the right of homestead relates to the quantity of land. This is confined, and properly so, to homesteads, "not in any city, town, or village;" in other words, to lands in the country. In lands thus situated, the homestead may contain hundreds, or even thousands of acres. The constitutional exemption is limited to eighty acres, to be selected by the owner thereof. This is so placed in the sentence, as to prove beyond all question that it relates alone to homesteads in the country. It precedes all mention of " any lot in the city, town, or village." It was thus placed, because of its want of appositeness to the succeeding, alternative right of exemption. Then follows the alternative clause, designed to provide for persons whose homesteads were not in the country, but who " owned and occupied" a lot in the city, town, or village. These are exempt, the other conditions being present, without any refer-

ence to quantity of acres. Following each of these, placed side by side, are two essential conditions of a valid homestead right, whether its *situs* be in the country, or in a city, town, or village. These are, that it shall be owned and occupied by a resident of this State, and that it shall not exceed the value of two thousand dollars. Every one will concede that ownership and occupation by a resident are essential to a valid homestead claim in the country. Every one will concede that that clause relates to each phase of the homestead right. Upon what principle, then, can it be contended that the clause in relation to value, must be confined to the homestead in a city, town, or village ? It is found in the same part of the sentence as the clause in reference to ownership and occupation, and connected with it by the copulative conjunction. If we hold that the limitation as to value does not relate to homestead in the country, by an irresistible rule of construction, we must hold that the ownership and occupation required by the clause are not conditions of a valid claim of homestead in the country. This construction would be so manifestly absurd, that we. deem further elaboration un- necessary.

In the constitution of Michigan, Art. XVI. sec. 2, there is a provision precisely like ours, on the subject we have been considering. In the case of *Wallace v. Harris*, 32 Michigan, 380–399, the homestead was in the country; and the court, without discussing the question, ruled, that the " area [of the homestead—quantity] depended on valuation ;" thus declaring a construction of the exact language of our constitution, precisely as we have done above.

3. Cases will, and do arise, in which the homestead in a city, town, or village, and even in the country, cannot be so reduced in area, as to be within the value of two thousand dollars limited by the constitution. For such case, the constitution makes no express provision. It is neither a " homestead, not exceeding eighty acres of land, and the dwelling and appurtenances thereon,       *       * .       and not in any town, city, or village,       *       *       *       not exceeding the value of two thousand dollars," nor is it a " lot in the city, town, or village, with the dwelling and appurtenances thereon,       *       *       *       and not exceeding the value of two thousand dollars." In such case, is there any mode by which the exemption can be secured to the owner, or an equivalent set apart to him ? It is a homestead which the constitution exempts—a residence and shelter for the family. Occupation and residence in the State are among the named conditions of its successful assertion. The exemption is surrendered and lost when the owner ceases to occupy it. It ceases to

operate, and ceases to exist against a mortgage, or other alienation, lawfully obtained from the owner thereof; with the *proviso* that, if such owner be a married man, then such mortgage or alienation shall not be valid without the voluntary signature and assent of the wife. If the attempt be made to allot and secure to the family an equivalent for the homestead, can it be so framed as to preserve the conditions and properties above enumerated? In the absence of legislation, we answer, manifestly not.

We have said above that the constitution of Michigan, on the subject of homestead exemption, is precisely like ours. The only difference is that, in that State, the exemption which the constitution secures shall not exceed, in quantity, forty acres, and, in value, fifteen hundred dollars. This works no change in principle. In the case of *Beecher v. Baldy*, 7 Mich. 488, the question was, whether any homestead, or equivalent for it, could be set apart out of premises, which, after being reduced to the lowest practicable quantity, was still of greater value than fifteen hundred dollars. The court ruled that it could not, the constitution making no provision for such a case. The court said : "But the constitution has only exempted a homestead, as an entirety; not a part of, or an undivided interest in a homestead ; and no latitude of construction can convert or pervert language into an exemption of fifteen hundred dollars in money, in lieu or compensation of a homestead. It is the *land*, including the dwelling-house and appurtenances, and constituting a homestead in fact, owned and occupied by the debtor, and nothing else, which the constitution exempts; and to bring it within the designation of a homestead, which the constitution, of its own force, exempts, it must possess all the descriptive features of the homestead described in the constitution as *exempt.*"

In that case, the court had previously propounded and answered the following inquiry, to-wit : "If, when reduced as far as divisible within the principles above expressed, it still exceed the value of fifteen hundred dollars, can it, under the constitution alone, without further legislation, be further divided; or can the courts, in any way, secure to the debtor a benefit equal to the fifteen hundred dollars?" The answer of the court was, "We think not."

In the case of *Helfenstein v. Cave*, 3 Iowa, 287, the same question arose, under a statute of that State. The court said: "If the homestead claimed exceeds $500 in value, is he entitled to the exemption? We answer that, as said above, when the quantity can be reduced so as to reach the given value, this may be done ; but, if, when reduced to the small-

est quantity, such as to the dwelling-house and its appurtenances—that is, to that which constitutes a messuage—it then exceeds the given value, we see no way in which to give him his homestead. The statute is explicit, that he may have his homestead, provided it does not exceed the value limited upon it. The corollary is clear, that if it does exceed, it is not exempt. It is true that this gives to him who has little, and takes from him who has much, or who has only more. We do not say this is a wise law. It has been changed. But we do not know any other way of interpreting it. Other statutes, with provisos similarly related, are construed in this manner. There is no provision for dividing the homestead; nor for setting off rents and profits ; nor for an extent; nor for selling the whole, and paying the debtor five hundred dollars, and applying the surplus to the debt; nor is there anything upon which the most liberal judicial construction can build any of these systems."

4. The last clause of section 2 is in the following language : " Such exemption, however, shall not extend to any mortgage lawfully obtained, but such mortgage, or other alienation of such homestead, by the owner thereof, if a married man, shall not be valid without the voluntary signature and assent of the wife to the same." In *McGuire v. Van Pelt*, at this term, we held that a mortgage of the homestead by the husband, without the signature and assent of the wife, is inoperative for any purpose whatever. It is *invalid*, and confers no rights, present or prospective. To hold otherwise would be to expose this most valued and cherished right to liens afterwards to attach, and to sale and incumbrance of the reversion, utterly subversive of its free and unembarrassed enjoyment as a homestead, and of the unrestrained power of sale, as the means of acquiring another, or for some other lawful purpose, which the constitution secures to the husband and wife. It may become a matter of interest and good policy to change the domicile; and, to that end, the constitution recognizes the unquestioned power of alienation. If, however, there be dominant liens, or sale or incumbrance of the reversion, ready to fasten upon the property as soon as it ceases to be the homestead of the family, then the power of alienation, which the husband and the wife have, ceases to have any value. We hold that such conveyance, without the signature and assent of the wife, is void.

What is meant by the words, "voluntary signature and assent of the wife ?" When the execution of the conveyance by husband and wife is acknowledged, or proved, and such acknowledgment or proof is certified according to law, is such certificate conclusive that the signature and assent are vol-

untary? What proof of unwillingness on the part of the wife will avoid the conveyance? It will be observed, that the constitution does not prescribe the form or requisites of the certificate, or other proof, necessary to show the assent and voluntary signature of the wife. We think, in such case, the form and substance of the certificate theretofore required to constitute recorded deeds evidence, without further proof of their execution, is sufficient.—See Revised Code, sections 1548 to 1552.

The question we are discussing is not new in the courts of justice. When families are about to lose the protection of the roof-tree, and to be turned homeless upon the world, it is but human that they should resort to every means within their power to avert so dire a calamity. Interest is no longer a disqualification to testify, under the statutes of this State. Impelled by keen apprehension of want, it is not surprising that parties to the suit, when on the witness stand, should testify under undue bias, no matter how honest their intentions to tell only the truth may be. Wives rarely join in a conveyance or incumbrance of a homestead, without a suppressed misgiving or reluctance. When in after years—perhaps after the death of the husband—such conveyances are about to be enforced, and the family dispossessed, how easy to prove by the wife herself, and perhaps by the children who have all the while been around her, that her signature was not voluntary, and that she did not assent to the conveyance. If such testimony can prevail to set aside solemn conveyances, acknowledged or proved, and certified according to the forms of law, what confidence can the public repose in land titles? It is much less hurtful that cases of individual hardship should be endured, than that, on testimony always open to distrust, the repose of society should be disturbed by so fearful discredit cast on the titles to real estate.

In what we have said above, we are travelling no untrodden path. In the case of *Graham v. Anderson*, 42 Ill. 514, the question we are discussing was presented. The certificate was in due form, and the magistrate testified to its correctness. Two or more of the children of the family testified, that they were present, and that Mrs. Graham was not interrogated as to her release of her right of homestead. Under their statute, it was required that the wife should be interrogated as to this fact. The court said, "When the cirtificate of the privy examination of a married woman is in the form required by the statute, it is not sufficient, in order to impeach it, to allege that there was no private examination—that she did not acknowledge the deed as her act and deed—that she did not release her homestead right. There

must be some allegation of fraud, or imposition practiced towards her—some fraudulent combination between the parties interested and the officer taking the acknowledgment." In the case of *Hill v. Bacon,* this doctrine was re-affirmed. 43 Ill. 477.

In the case of *Hawkins v. Forsyth,* 11 Leigh, 294, the question was, what credit should be accorded to the certificate of the magistrates, as to the privy examination of the wife, who joined the husband in the conveyance of land. The court, Prest. TUCKER, said : "It [the statute] has empowered them to take and certify the examination and acknowledgment, which it also makes one of the functions of its courts of justice, and thus appears to invest them with an authority judicial in its nature. But, above all, it constitutes their certificate the authentic and sole medium of proving that the *feme covert* has acknowledged the deed with all the solemnities required by the statute. * * * All the considerations which forbid the introduction of parol testimony to contradict the written contract of the parties, because it is presumed that what has been definitely agreed on is there set down, conspire with the influence of other principles to protect this solemn consummation of a contract, under the sanction of the magistracy, from being rendered nugatory and void, after the lapse of years, by the slippery testimony of witnesses."

In reference to the introduction of testimony to contradict such certificate, the same court had well and forcibly said : "But, if the door be once opened to contradictions of the magistrates' certificates, where is the point at which we shall stop ? The writing must be explained ; and if the certificate that it was explained can be contradicted, what shall prevent inquiry whether it was truly explained ? for, if not truly explained, the condition of the *feme* is surely not better than if the deed were not explained at all. And if, in the complicated provisions of a settlement, the justices become entangled, what shall prevent the proof by the *feme* that she has, in truth, executed a deed altogether different in effect from the explanations which were given to her of that which she had signed ? And if these inquiries are to be permitted, and that too when the *feme* has lain by during the lifetime of the husband, and rakes up these objections at a remote day, of what value will your privy examination be ? Who will take a title depending upon, or which can be traced through them ? No one. To me it seems that the demon of mischief could not suggest a notion better calculated to throw all things, in relation to titles, into their original chaos, than the establishment of the principle here contended for."

In the case of *Chestnut v. Shane,* 16 Ohio, 599, the court

ruled, that " a deed of a married woman is valid, and passes her estate, where there exists no other objection than that the justice, in certifying her acknowledgment, has omitted incorporating into the certificate the statement that, before and at the time of her making such acknowledgment, he made the contents known to her, by reading or otherwise." To the same effect are *Fosdick v. Risk*, 15 Ohio, 84; *Williams v. Robson*, 6 Ohio St. 513.

The following authorities fully sustain the case of *Graham v. Anderson, supra: McNeely v. Rucker*, 6 Blackf. 391; *Hartley v. Frost*, 6 Texas, 208; *Bissett v. Bissett*, 1 H. & McH. 211; *Ridgeley v. Howard*, 3 H. & McH. 321; *Campbell v. Taul*, 3 Yerg. 548; *Card v. Patterson*, 5 Ohio St. 319.

The case of *Schrader v. Decker*, 9 Penn. St. 14, comes fully within the exception admitted in *Graham v. Anderson, supra*, and therefore is not an authority against the principle stated above. That was a strong case of undue restraint and deception of the wife, in which the grantee officiously intermeddled; and the facts patent to the court were well calculated to arouse the indignant ire of Chief-Justice Gibson.

The case of *Morris v. Sargent*, 18 Iowa, 90, is somewhat at war with the views above expressed. From the opinion of the majority, Justice Dillon dissented, in an able opinion, fully approving the principles of *Graham v. Anderson, supra*. We concur in the views of Judge Dillon, and in the principles declared in *Graham v. Anderson*. See, also, *Kew v. Russell*, 69 Ill. 666; *S. C.*, 18 Amer. Rep. 634.

Homestead exemption under section 2, Art. XIV of the constitution, being dependent on continued occupancy of the premises, ceases when that occupancy, from any cause, is put an end to. If the husband die, leaving no surviving widow, or infant children, the exemption is at an end, and the homestead falls into the general estate, as other property of the decedent. The shield thrown around it by the constitution ceases to protect it from creditors, and it is left for administration, devise, or descent, as other real property is. If decedent leave a widow, or widow and infant children, or the latter without the former—then the exemption is continued under sections 3 and 5 of said article XIV. This, however, is a mere exemption from levy and sale, and vests no title, beyond a right to occupy, in either the widow or children. They cannot convey or incumber it. When the widow dies, or the infants attain majority, the exemption ceases, and the property reverts to the estate of the husband. The exemption continues, however, " in all cases during the minority of the children," whether the widow live so long or not.

5. Section 2, we have said, exempts the homestead only during the life of the husband, and only as against "executions, or other final process from a court." This section, without more, would operate an exemption, only during the life of the owner. Section 3 makes provision for a continuation of the homestead exemption of the family, after the death of the owner, "in all cases during the minority of the children." "Shall be exempt from the payment of any debts," &c., is the language of the constitution. If this language be construed by itself, without any reference to other provisions of this article of the constitution, the exemption is only from the payment of *debts*, and will leave it under the unrestrained operation of the law of descents, or under the devises of the will, if there be one. Such construction would deprive this provision of every element of benefit to the minor children; for, in the event there were adult children, the homestead would pass from them, *as a homestead*, by the descent and partition that would follow. Moreover, as the exemption from the payment of debts is to continue only during the minority of the children, we would have the singular result, of the descent and partition of the homestead among all the heirs, to be enjoyed by them only during the minority of such of the children as were minors; and when they all reach their majority, the land would go back to the estate, for the benefit of creditors or heirs, as the case might be.

But section 5 goes further, and not only declares that the homestead shall be exempt in the case therein provided for, but declares that "the rents and profits thereof shall enure to" the widow's benefit. This clearly shows that, under section 5, the doctrine of devises and descents has no application to the interest therein reserved to the widow. The dependent beneficiaries, provided for in section 3, plead as imploringly to the fostering arm of the law-making power, as she does who is cared for in section 5. No rule of policy, or philanthropy, prompts a bestowal of the rents and profits on the latter, that does not apply with equal force to the former. Each alike is a worthy object of legislative foster-care.

We hold that sections 2, 3 and 5 of article XIV of the constitution, were intended to supply, and do form a system of homestead exemptions, to last during the lifetime and occupancy of the owner; and if he leave a widow, then during her lifetime; and if she die, either before or after the husband, then to continue "during the minority of the children." This is the rule "in all cases," and furnishes the proper field for the operation of the words, "in all cases." We hold also that the homestead, to the extent above expressed, is alike exempt from administration, descent and devise, as from

"execution or other final process," obtained on any debt contracted after the adoption of the constitution of 1868.

6. The homestead exemption provided in the constitution, from debts contracted after its adoption, is incompatible with that provided for by the Revised Code, section 2061, subd. 6, and section 3539 G. The two cannot stand and be administered together. The constitution repealed all previous statutory homestead exemptions, from debts contracted after its adoption.—*George v. Skeates*, 19 Ala. 738.

There is not the same incompatibility, however, between the constitutional exemption of personal property of a decedent, and that theretofore existing by statute. The constitution makes no provision whatever for exemption of personal property after the death of the owner. Therefore, the statutes on that subject, in force at that time, are unaffected by that instrument.

7. There have been changes by statute, since the adoption of the constitution of 1868. First, by the act of February 8th, 1872, Pamph. Acts 1871-2, p. 91; but we propose not to comment on this at present. Second, the act "to regulate property exempted from sale for the payment of debts," approved April 23d, 1873 (Pamph. Acts, 64), has wrought many changes in the constitutional exemptions. In the recent cases of *Taylor v. Taylor*, 53 Ala. 135, and *Rottenbury v. Pipes*, 53 Ala. 447, we held that the right to claim exemption of property, real or personal, from liability for debts of the husband, depends on the laws in force at the time of the death of the husband. We adhere to that view.

8. We have said that the act of April 23d, 1873, has wrought many changes in the constitutional exemptions. Among the most important of the statutory changes in homestead, are: First, an increase of the area of the homestead, if in the country, to one hundred and sixty acres, and an entire ignoring of the limitation of value of such homestead. Second, when the homestead is in a city, town, or village, and after being reduced to the lowest practicable quantity, it still exceeds two thousand dollars in value, the statute makes provision for carving out of it an equivalent in money. Third, in case the estate of any decedent is insolvent, his homestead, if he leave wife or child, vests absolutely in his wife and child, or children. Fourth, the mortgage, or other alienation of the homestead, by the owner, if a married man, must not only have the voluntary signature and assent of the wife, to render it valid, but her "voluntary signature and assent must be shown by the examination of the wife separate and apart from the husband." The statute makes other changes, not necessary to be noted here. These changes operate on

all homestead exemptions, which have accrued since April 23d, 1873.

Under the rules above declared, the case of *Thomas P. Miller v. Melaine Marx* must be reversed, on two grounds: First, Mrs. Marx' claim of homestead accrued in 1870, and is governed alone by the provisions of the constitution of 1868. The homestead being in the city of Mobile, and not susceptible of division so as to reduce it, in value, to a sum "not exceeding two thousand dollars," she has no valid right of homestead. Second, Mrs. Marx having joined in the mortgage to Miller, and the certificate of acknowledgment being correct in form, there is no sufficient proof in the record "of fraud, or imposition practiced toward her, or of fraudulent combination between the parties interested and the officer taking the acknowledgment," to invalidate the certificate. The decree of the Chancery Court is therefore reversed, and this court, proceeding to render the decree which the court below should have rendered, doth hereby order and decree, that the bill of complaint be dismissed at her cost, in this court, and the court below.

In the case of *Thomas W. Coleman v. M. J. Smith*, the decree of the Probate Court is reversed, because neither the homestead, nor the exemption in personal property, should have been allotted under the acts of February 8th, 1872, or of April 23d, 1873. The decree is therefore reversed, and the cause remanded.

In the case of *John R. Taylor v. Mary E. Anthony and Edward Anthony*, the decree of the Probate Court is reversed, because, from anything apparent in the record, the claim of homestead by the appellees must be governed by the constitution of 1868. If the debts of the estate, against which the exemption is claimed, existed before June 25th, 1868, then the claim is to be governed by other laws. The decree is reversed, and the cause remanded.